IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

RAYMOND K. HEDGESPETH, JR.,

Plaintiff,

v.

KIRSTEN JOHNSON, DR. DANIEL
KOTTENBROCKER, and JOEL SHIREK,

Defendants.

OPINION and ORDER

26-cv-275-jdp

---

Plaintiff Raymond K. Hedgespeth, Jr. is a civilly committed patient at Sand Ridge Secure Treatment Center. Hedgespeth alleges that Sand Ridge staff denied him adequate mental health care by placing him on suicide watch after Hedgespeth said that he thinks about committing suicide from time to time. Hedgespeth is proceeding without counsel.

Hedgespeth is also proceeding without prepaying the filing fee, so I must screen the complaint under 28 U.S.C. § 1915(e)(2)(B) and dismiss any part of it that is frivolous or malicious, fails to state a plausible claim for relief, or seeks money damages from an immune defendant. I must accept Hedgespeth's allegations as true and construe them generously, holding the complaint to a less stringent standard than one a lawyer drafts. *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011). I will dismiss the complaint for failure to state a plausible claim for relief, but I will allow Hedgespeth to amend the complaint to fix the problems identified in this order.

ALLEGATIONS OF FACT

Hedgespeth has been held at Sand Ridge for 25 years because he "might commit another sex crime." Dkt. 1 at 2. The "might commit" takes a heavy toll on him, and the "might" is at

times "almost unbearable." *Id.* Hedgespeth has suffered from depression for decades and he first attempted suicide at the age of 14.

For quite some time, Hedgepeth's therapist, Sandy Harper, had been asking him to trust her and allow himself to be open and vulnerable with her. Then, on December 16, 2025, during a therapy session, Hedgespeth told Harper that he contemplates suicide from time to time, but that he would not commit that act while his mother was alive. Hedgespeth had previously promised staff in the health services unit (HSU) that he would talk to someone if he ever felt like committing suicide.

A couple of hours later, Hedgespeth was in the HSU, where a nurse, Nutcharee Chariakram, interviewed him. After the interview, Chariakram called Dr. Ness. After that conversation, Chariakram told Hedgespeth that he was being placed on "Suicide Prevention Status 2." *Id.* at 1. As a result, Hedgespeth was moved to the most secure unit in Sand Ridge, "AD." *Id.*

In AD, Hedgespeth was forced to remove all his clothes and wear only an anti-suicide smock. Wearing a smock made Hedgespeth feel embarrassed and degraded, partly because women were in AD and could see him.

Hedgespeth's "declarations" that he was fine "fell on deaf ears." *Id.* "No matter how much [he] pleaded to be heard, . . . no one cared." *Id.* Hedgespeth was "simply asked a series of questions," the primary one of which was whether he "had a plan." *Id.* Hedgespeth did not get to speak with a psychiatrist while he was in AD.

Hedgespeth was eventually released from AD after speaking with a nurse, Tara Gates, who "was willing to take the time to listen" to him. *Id.* at 2. Hedgespeth does not allege how long he was in AD, but his stay was shorter than "several weeks." *See id.*

ANALYSIS

## A. Clarifying Hedgespeth's claims

Hedgespeth does not expressly allege any cause of action. I take Hedgespeth to bring a Fourteenth Amendment due process claim based on the denial of adequate mental health treatment in connection with his statement that he thinks about committing suicide from time to time.

I do not take Hedgespeth to bring a federal claim based on the allegation that he was required to remove all his clothes and wear only an anti-suicide smock in a unit where women could see him. Even if wearing a smock made Hedgespeth feel embarrassed and debased, his allegations don't suggest that any woman saw him naked. *See Canedy v. Boardman*, 16 F.3d 183, 187 (7th Cir. 1994) ("[O]ccasional or inadvertent sighting by female prison employees of inmates in their cells or open showers do not violate the inmates' right to privacy."). I will analyze only a due process claim based on the denial of adequate mental health treatment.

## B. Screening the due process claim

Due process requires that "those who are civilly committed as sexually violent persons receive 'some treatment,' as determined by mental-health professionals exercising professional judgment." *Hughes v. Farris*, 809 F.3d 330, 334 (7th Cir. 2015). To state a claim, Hedgespeth must plausibly allege that his treatment was "a substantial departure from accepted professional judgment." *See id.* Hedgespeth's mere disagreement with a mental health professional's treatment does not meet the professional judgment standard. *See Walker v. Jumper*, 758 F. App'x 521, 526 (7th Cir. 2019) (citing *Youngberg v. Romeo*, 457 U.S. 307, 321–32 (1982)). "It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." *Youngberg*, 457 U.S. at 321.

I take Hedgespeth to base his due process claim on three theories: (1) he should have been allowed to express his sporadic suicidal ideations without being put on suicide prevention status; (2) no one took the time to listen to him while he was in AD; and (3) he would have been released from AD sooner if Sand Ridge had a policy to allow patients in AD to speak with a psychiatrist.

I begin with the first theory, i.e., Hedgespeth's desire to be able to express suicidal ideations without being placed on suicide watch. There is a preliminary problem: lack of personal involvement. Individual liability under 42 U.S.C. § 1983 requires personal involvement in the alleged constitutional deprivation. *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017). As a general rule, a plaintiff "cannot state a claim upon which relief may be granted against defendants not discussed in the body of the complaint." *Stewart v. Rice*, No. 12-cv-339-bbc, 2012 WL 2328227, at *2 (W.D. Wis. June 19, 2012).

Hedgespeth names as defendants three high-ranking Sand Ridge officials: (1) the secretary, Kirsten Johnson; (2) the medical director, Dr. Daniel Kottenbrocker; and (3) the director, Joel Shirek. But Hedgespeth doesn't allege that any defendant was involved in the decision to place him on suicide prevention status. Nor has Hedgespeth alleged any facts plausibly suggesting that any defendant created any policy requiring any medical professional to place a patient on suicide prevention status any time that a patient expresses suicidal ideations. I would not allow Hedgespeth to proceed on a due process claim based on the first theory because of this problem alone.

But the first theory is more substantively flawed. Hedgespeth alleges that his lengthy civil commitment has taken a heavy mental toll on him, that he has a longstanding case of depression, and that he has attempted suicide at least once. Hedgespeth also alleges that he

told Harper that he contemplates suicide from time to time. Despite Hedgespeth's assurances that he would not commit suicide (at least while his mother was alive), these statements show that a medical professional reasonably could have determined him to be at an elevated risk of suicide. Hedgespeth also alleges that, after his session with Harper, nurse Chariakram interviewed him. Hedgespeth doesn't discuss the contents of the interview, but Chariakram's decision to consult with Dr. Ness suggests that she too had serious concerns about potential suicide. And Dr. Ness apparently made or approved the decision to place Hedgespeth on suicide prevention status, which means that at least three medical professionals were involved in the decision. Hedgespeth's allegations don't plausibly suggest that any Sand Ridge employee involved in the decision to place him on suicide prevention status substantially departed from accepted professional judgment in making that decision. I will not allow Hedgespeth to proceed on a due process claim based on the first theory.

Hedgespeth's second theory is that no Sand Ridge employee would listen to him while he was in AD. Hedgespeth alleges that the employees asked perfunctory questions and were excessively focused on whether he had a plan to commit suicide. Hedgespeth adds that, if the employees had listened to him more carefully, he would have been released from AD sooner.

As with Hedgespeth's due process claim based on the first theory, he does not allege any facts suggesting that any defendant played any role in this deprivation. Hedgespeth does not even identify by name the Sand Ridge employees who committed this conduct. And without more details about the employees' communications with Hedgespeth while he was in AD, I cannot plausibly infer that any employee provided treatment that substantially departed from accepted professional judgment. Hedgespeth's allegations that the employees were

excessively focused on a plan, without more, doesn't suggest that to be the case. I will not allow Hedgespeth to proceed on a due process claim based on the second theory.

Hedgespeth's third theory is that he would have been released from AD sooner if Sand Ridge had a policy to allow patients in AD to speak with a psychiatrist. To start, Hedgespeth's allegations don't suggest that Sand Ridge had an official policy or a custom disallowing patients in AD to speak with a psychiatrist. Hedgespeth's theory seems to be that he was denied adequate mental health care because a psychiatrist didn't see him while he was in AD. But Hedgespeth hasn't alleged any facts suggesting that the treatment that he received in AD was inadequate, or that a psychiatrist would have provided more appropriate care. Hedgespeth's pure speculation doesn't state a plausible due process claim. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level."). Also, Hedgespeth alleges that nurse Gates released him, or persuaded other staff to release him, which belies the idea that seeing a psychiatrist was necessary to obtain his release. I will not allow Hedgespeth to proceed on a due process claim based on the third theory.

CONCLUSION

I will give Hedgespeth one opportunity to amend the complaint to fix the above pleading problems. The amended complaint must be filed on the court's nonprisoner complaint form, which the court will send him with this order. If Hedgespeth needs additional space, he may include no more than five supplemental pages. Any text on the form or a supplemental page must be large enough and have enough spacing between lines and in the margins to ensure readability. Hedgespeth's original complaint lacks enough spacing between the lines to ensure readability.

In drafting his amended complaint, Hedgespeth should remember to:

- Carefully consider whether he is naming proper defendants and omit defendants who did not personally participate in or cause a violation of his rights. Hedgespeth must take care to allege what each defendant did, or failed to do, to violate his rights.

- Avoid referring to several defendants together. For instance, if more than one defendant has taken a particular action that Hedgespeth believes supports a claim, he should identify each defendant who took that action.

- Identify by full name all the individuals he wishes to sue in the amended complaint's caption.

- Omit legal arguments other than explaining what types of claims he wishes to assert.

ORDER

IT IS ORDERED that:

1. Plaintiff Raymond K. Hedgespeth, Jr.'s complaint, Dkt. 1, is DISMISSED.

2. Plaintiff may have until July 10 to file an amended complaint that fixes the problems identified in this order.

3. Plaintiff must file his amended complaint on the court's nonprisoner complaint form, which the court will send him with this order. Plaintiff must fill out the form completely.

4. The amended complaint will act as a complete substitute for the complaint. This case will proceed on only the allegations made and claims presented in the amended complaint, and against only the defendants specifically named in the amended complaint's caption.

5. If plaintiff fails to comply with this order, I may dismiss the case.

6. Plaintiff should keep a copy of all documents for his own files. If he is unable to use

7

a photocopy machine, he may send out identical handwritten or typed copies of his documents.

7. Plaintiff must inform the court of any new address. If he fails to do this and defendants or the court cannot locate him, this case may be dismissed.

Entered June 10, 2026.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge